THURBER and another *v.* OLIVER.[1]

*(Circuit Court, D. Maryland. April Term, 1885.)*

1. COLLATERAL SECURITY — STORAGE RECEIPT BY PERSON NOT A WAREHOUSEMAN—VALIDITY—ACT OF LEGISLATURE MARYLAND 1876, c. 262.

Under the Maryland act of legislature of 1876, *c.* 262, as construed in *State* v. *Bryant,* 63 Md. 66, a storage receipt, issued by a person not a warehouseman, for his own property, in his own possession, is not good against a subsequent bill of sale or assignment for the benefit of creditors.

2. SAME—PLEDGE—ESSENTIALS—POSSESSION.

The taking and retaining possession by the pledgee are essential elements in a pledge of goods.

3. SAME—GOODS AS COLLATERAL—SYMBOLICAL DELIVERY—SAMPLES.

If goods be pledged to a person as collateral security, but the debtor still retain possession of them, the delivery of samples to the agent of the creditor to facilitate sales of the goods by him on behalf of the debtor is not a delivery of the goods.

Replevin. Ruling upon prayers for instruction to the jury.

In this case the plaintiffs caused to be issued a writ of replevin out of this court on the twenty-first day of June, 1884, under which 3,000 cases of canned tomatoes were taken from a building in Harford county, Maryland, which had been occupied by the defendant, Oliver. Oliver had been for some years engaged in the business of canning tomatoes in Harford county, and in October, 1883, had upwards of 3,000 cases of canned tomatoes in the premises where he carried on this business. Being in need of money to enable him to hold them for better prices, he applied to the agent of the plaintiffs, who agreed to loan him on the security of the goods $4,200 for four months. Thereupon he executed the following promissory note and storage receipt:

"$4,200. HARFORD FURNACE, MD., October 16, 1883.

"Four months after date I promise to pay to the order of H. K. and F. B. Thurber & Co., New York, forty-two hundred dollars, for value received, without defalcation. Along with the foregoing obligation I have delivered to H. K. and F. B. Thurber & Co. 3,000 cases No. 3 labeled tomatoes, as collateral security for the payment of the same on the day that it becomes due; which collateral I hereby authorize and empower the holder of this promissory note (provided the same be not paid at maturity) to sell at public or private sale, and transfer without further reference or notice to me, and apply the proceeds in payment thereof, together with interest and charge incurred thereon. Thereafter, should any deficiency remain unpaid, I further promise and agree to pay the same to the holder hereof on demand.

"THOS. J. OLIVER."

The storage receipt was as follows:

"No. 3. HARFORD FURNACE, MD., October 16, 1883.

"Received on storage in my warehouse, from H. K. and F. B. Thurber & Co., three thousand cases No. 3 labeled tomatoes; deliverable to the order of H. K. and F. B. Thurber & Co. only on production of this receipt properly indorsed. THOS. J. OLIVER."

[1] From Maryland Law Record.

The goods remained in the same building until the execution of the writ of replevin, in June, 1884, but Oliver retained possession of the premises only until January, 1884, when the landlord obtained from Oliver the key of the building, with a view of securing his rent, and also obtained from Oliver a duly-executed and recorded bill of sale to secure about $1,600 of rent claimed. On April 25, 1884, Oliver executed a deed of trust of all his property for the benefit of creditors to Harlan & Webster, trustees, which was duly recorded; and at the time the writ of replevin was executed Oliver had left the premises, and had delivered possession of the goods to an agent of the trustees, who was also an agent of the landlord, and was holding them for the protection of both interests.

There was evidence from which plaintiffs contended that the amount intended to be secured by the bill of sale to the landlord has been paid. There was also evidence tending to show that both the landlord and the trustees for creditors had knowledge, before the conveyances to them, that the plaintiffs had loaned money to Oliver on the security of the goods.

*Blackistone & Blackistone*, for plaintiffs.

*H. W. Archer* and *A. Stirling, Jr.*, for defendant.

MORRIS, J. It is the misfortune of the plaintiffs in this case that they have now to support their title to the goods replevied by invoking principles of law which were not in contemplation when the transactions were entered upon. When the plaintiffs advanced to Oliver $4,200, on October 16, 1883, on the collateral security of 3,000 cases of canned tomatoes, they relied for their protection upon the storage receipt as valid and sufficient, under the Maryland act of 1876, (chapter 262,) to pass to them, in the language of that act, "a full and complete title to the property mentioned in the receipt, with all rights and remedies incident to such title." This was at that time generally thought to be the intention and effect of the act of 1876 with respect to such storage receipts. But since the date of this transaction the court of appeals of Maryland, in the case of *State* v. *Bryant*, 63 Md. 66, has construed the act of 1876, and has declared that its provisions do not apply to storage receipts issued by persons who are not warehousemen, for their own property remaining in their own possession. The court of appeals in its opinion points out that the obvious result of any other construction would be that any individual could issue a storage receipt for any chattel in his possession, and thus entirely subvert the registration laws which have been enacted for the protection of purchasers and creditors. The plaintiffs, therefore, although the evidence shows that the transaction was one based on the validity of the storage receipt under the act of 1876, are now obliged to assert their rights, unassisted by the provisions of that act.

What, then, was the legal character of the transaction which the parties intended to make? The promissory note sets it out plainly:

"Along with this obligation, I have delivered to H. K. and F. B. Thurber & Co. 3,000 cases No. 3 labeled tomatoes, as collateral security for the payment of the same, * * * which I authorize and empower the holder of this promissory note (provided the same be not paid at maturity) to sell,", etc.

Suppose that the 3,000 cases of goods had been at that time actually put out of the possession of Oliver into the possession of the plaintiffs, what would the transaction have been, as evidenced by that fact and expressed in this paper? The goods were not sold, assigned, or conveyed to the plaintiffs, but were intended to be simply delivered to them to hold as collateral security for the payment of the note, with power to sell in case of default. This is what the parties thought they were doing, and intended to do; and, if they had effectually accomplished it, the transaction would have been what is known as a pledge of chattels, as distinguished from a mortgage or sale.

The distinction between a mortgage and a pledge is clearly stated by Judge MILLER in *Dungan* v. *Life Ins. Co.*, 38 Md. 251:

"The general distinction is that in a mortgage the title is conveyed with a condition of defeasance,—that is to say, a condition rendering the conveyance void on the payment of a certain sum of money on or before a day agreed upon,—while in a pledge the goods bailed are deposited as a collateral security, and only a special property is transferred to the bailee, (the general title in the meanwhile remaining with the bailor.) The difference has also been well stated thus: A mortgage is a pledge, and more; for it is an absolute pledge to become an absolute interest, if not redeemed at a certain time. A pledge is a deposit of personal effects, not to be taken back but on payment of a certain sum by express stipulation, or by the course of trade, to be a lien upon them."

To the same effect is the text in Jones, Pledges, § 8:

"Whenever there is a conveyance of the legal title to personal property upon an express condition subsequent, whether contained in the conveyance or in a separate instrument, the transaction is a mortgage. Thus, if a bill of sale of a horse be made, and at the same time a defeasance be given back by the purchaser engaging that on the payment of the purchase price within a specified time he will redeliver the horse, the transaction is a mortgage, and not a pledge of a horse. An instrument in writing which records a debt, and declares that the debtor does thereby deliver certain property to his creditor to secure the debt, is a pledge and not a mortgage; because there is no transfer of the title to the property, but only a deposit of it. Although an instrument contains a covenant to warrant and defend the title, such as is usual in a mortgage, the character of the instrument is not thereby changed. The covenant is not a present conveyance, but an executory stipulation. A delivery of personal property by a debtor, in security for a debt accompanied by a written agreement, whereby the debtor agrees that if he does not pay the debt by a certain time the creditor may dispose of the property to pay the debt, is a pledge and not a mortgage; for the agreement does not show any intention to transfer a title to the property absolutely or conditionally, but only to deliver the property as security, with a right in the creditor to sell it if the debt be not paid by a certain time."

Thus it appears that the very words by which a pledge is defined in the books are the words used to express the agreement contained in the obligation given by Oliver to the plaintiffs.

If, then, the transaction is to be treated as an attempt to secure the plaintiffs the money advanced by a pledge of the goods, it follows that delivery and continued possession were essential to render the pledge effective. This rule is tersely stated in Jones on Pledges, (section 23:) To constitute a "pledge the pledgee must take possession, and to preserve it he must retain possession." The delivery and possession required is not a mere agreement of parties which they can make on paper, but must be some sufficient act of an unequivocal character.

This rule of law is upheld and inexorably applied by the supreme court of the United States in *Casey* v. *Cavaroc*, 96 U. S. 467. In that case a New Orleans national bank borrowed a very large sum of money from the Credit Mobilier, of Paris, upon an agreement on the part of the bank to place and always keep for the security of the lender a sufficient amount of good negotiable notes in the hands of the firm of which Cavaroc, the president of the bank, was a member. Notes to the required amount were placed in an envelope, and given to Cavaroc to hold as a pledge; but he, finding it inconvenient to take out those maturing from day to day, and to replace them with others in their stead, delivered the envelope to the discount clerk of the bank, and the notes, with those which from time to time were substituted, were kept by him until the failure of the bank, when Cavaroc took and retained them on behalf of the Credit Mobilier. At that time the indorsement of the bank was put upon the securities, which had not been done before. Mr. Justice Bradley, delivering the opinion of the court, (page 486,) said:

"It must not be overlooked that the Credit Mobilier has no other claim to the securities in question but that of pledge. A pledge and possession, which are its essential ingredients, must be made out or the privilege fails. An agreement for a pledge raises no privilege. There is no mortgage; for the title of the securities was never transferred to them. The evidence of the cashier is that they were all stamped, payable to the order of the bank when discounted. They were not indorsed by the cashier until the day they were removed by Cavaroc, which was after the bank failed."

And on page 490:

"Where the legal or equitable property in a security passes, and there is no express law invalidating the transfer, the creditor will be entitled to hold it as well against the assignee or receiver as against the debtor; because the assignee only takes such title as the debtor has at the time of the assignment or insolvency. In that case, however, the question of fraud would be admissible as a question of fact to invalidate the transaction; but in the present case that question does not arise, or, if it might be raised, it is immaterial. The Credit Mobilier claims a privilege by virtue of a pledge; and such a privilege, as we have seen, cannot be maintained as to third persons without possession. Bad faith, it is true, would defeat the pledge, though the creditor had possession. But want of possession is equally fatal, though the parties may have acted in good faith. Both are necessary to constitute a good pledge so as to raise a privilege against third persons. The requirement of possession is an inexorable rule of law adopted to prevent fraud and deception; for, if the debtor remains in possession, the law presumes that those who deal with him do so on the faith of his being the unqualified owner of the goods."

In the present case, as in the case just cited, there was no transfer of title, and (independently of the storage receipt) there was no change of possession. The goods were Oliver's, and in Oliver's storehouse before the transaction, and, except as affected by the storage receipt, remained afterwards in precisely the same situation, until possession of them was obtained under the landlord's bill of sale and under the deed of trust for the benefit of creditors. The few cans delivered to Maj. Hancock, who was the plaintiffs' agent after the completion of the transaction, were samples for him to sell by, under an agreement between Oliver and himself, that he might negotiate sales of the goods for him. But, even if there was evidence to support the idea that the delivery of the samples was intended as a sort of symbolical delivery of the whole, such a delivery is not in such a case that which is required by the Maryland statute to change possession so as to pass title without a bill of sale. It is urged by plaintiffs' counsel that the wording of the note and storage receipt evince an intention to deliver the goods. But evidence of intention is only to be considered when the act said to amount to a delivery is an equivocal act which might amount to a delivery or not, according to the intention of the parties. But an act which is not in the nature of a delivery, according to the thing to be delivered, cannot be made a delivery by an agreement or an intention.

Applying this view of the law, it seems to me clear that, at the time the replevin was issued, all that the plaintiff could claim to assert was a lien or privilege against the goods for the amount of their loan, and as that privilege could only be maintained by continued actual possession they must fail in this action. But even if, as against Oliver, it were possible to maintain the action, I think that as against the persons who, since the date of the transaction between the plaintiffs and Oliver, have obtained title by bill of sale and actual possession of the goods, (even with notice of the transaction,) the plaintiffs cannot succeed in this action.

The case of the plaintiff is different from that of a person who has a conveyance of the title to goods sufficient in form to convey the title, and which is only defective for want of compliance with the statute in respect to acknowledgment, recording, or affidavit. In *Hudson* v. *Warner*, 2 Har. & G. 415, a case much relied upon by plaintiffs' counsel, the court of appeals declared the act of assembly with regard to registration of bills of sale to have for its object the suppression of secret sales, so that no one should be injured or deluded by secret and unknown sales; and the court therefore held that any notice which demonstrated the existence of a lien or the transfer of a right would be sufficient in lieu of registration. But, to make the doctrine applicable, it must first appear that a transaction was intended between the parties to which a conveyance proper for registration was appropriate.

In the view I have taken of the transaction in this case, there never was designed to be any sale, mortgage, or transfer of title to the goods.

The transaction, even upon the theory of the plaintiffs, is that Oliver delivered the goods to the plaintiffs in pledge, and the plaintiffs immediately placed them with Oliver on storage. There is no attempt to make a bill of sale, nor any agreement to make a bill of sale, nor to transfer title. Suppose the claimants, who were in possession under the subsequent bills of sale, and whose titles are set up in the pleas, had known of the whole transaction, and had the storage receipt and the note exhibited to them, I do not see how their rights under these bills of sale could be affected legally by that knowledge, for the storage receipt and note are notice of nothing but what in law they can accomplish. In effect they amounted to this: that Oliver acknowledged that he owed the plaintiffs $4,200, payable in four months from October 16, 1883, and, as collateral security, he authorized the plaintiffs, in case of default, to take the 3,000 cases of tomatoes out of his possession, and sell them, and apply the proceeds to the debt.

Further, with regard to the deed of trust set up by one of the pleas, it seems to me clear that it is sufficient, without regard to any question of notice, to defeat plaintiff's action. There was actual possession under it at the time of the execution of the writ of replevin. Now, treating the agreement between Oliver and the plaintiffs in the most favorable light, it could at most amount to a contract for security, enforceable in equity, and to be postponed, under the Maryland Statutes, to all creditors of Oliver, who might have become such after its date, and without notice. It is said by the plaintiffs that there are no such creditors; but could this court properly decide that question? Those creditors, if there be any, are not and could not get before this court. They are represented by the trustees. The validity of the deed of trust is not questioned, and such creditors could only assert their claims in a court having control of the distribution of the fund arising from the deed. The question whether there are such creditors, whether their claims, if established, are to have preference, or whether these plaintiffs have an equitable right to be paid in preference to all other creditors, can only be determined by a court of equity distributing the fund, having all the parties before it, and adjudicating their priorities.

The verdict must be for the defendant.